OA 91 Criminal Complaint

# United States District Court

__NORTHERN__ DISTRICT OF __CALIFORNIA__

FILED
APR 0 7 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
V.
MIGUEL DOMINGUEZ MURILLO
MIGUEL DOMINGUEZ MURILLO, JR.
FLORENTINO GONZALEZ

**CRIMINAL COMPLAINT**

Case Number: 3 08 70203 JL

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about __02/15/08 THROUGH 04/01/08__ in __SONOMA__ County, in
(Date)
the __NORTHERN__ District of __CALIFORNIA__ defendant(s) did,

(Track Statutory Language of Offense)
KNOWINGLY AND INTENTIONALLY AGREED TO COMMIT THE CRIME OF POSSESSING MORE THAN FIFTY GRAMS METHAMPHETAMINE WITH THE INTENT TO DISTRIBUTE OR SELL IT TO ANOTER PERSON.

in violation of Title __21__ United States Code, Section(s) __841(a)(1) & (b)(1)(A) (viii) and 846.__

I further state that I am a(n) __Special Agent, Federal Bureau of Investigation__ and that this complaint is based on the following facts:
See attached Affidavit of FBI Special Agent Michael Major

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

Approved As To Form: __Susan R. Jerich__ AUSA

Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

__4-7-08__ at San Francisco, California
Date                            City and State

James Larson, Chief U.S. Magistrate Judge
Name & Title of Judicial Officer                    Signature of Judicial Officer

# AFFIDAVIT OF MICHAEL G. MAJOR

I, Michael G. Major, Special Agent of the Federal Bureau of Investigation, United States Department of Justice, being duly sworn, do declare and state:

1. I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been so employed since September 2004. I am presently assigned to the Santa Rosa Resident Agency of the San Francisco Division of the FBI. I have participated in investigations of cases involving violent gangs, narcotics trafficking, bank robbery, financial crimes, and corruption of public officials. I have received training at the FBI Academy in Quantico, Virginia, to include training on violent crimes, narcotics investigations, case management, informant development, and Title III investigations. I obtained the information set forth below either through my own investigation or from conversations with and/or written reports of other FBI Special Agents, Drug Enforcement Administration (DEA) Special Agents, and state and local law enforcement officers.

2. This Affidavit is made in support of a Criminal Complaint charging **MIGUEL DOMINGUEZ MURILLO ("MURILLO"), MIGUEL MURILLO, JR. ("MURILLO, JR."),** and **FLORENTINO GONZALEZ ("GONZALEZ")** with a violation of Title 21, United States Code, Section 846, conspiracy to possess with intent to distribute over one (1) pound of methamphetamine.

3. In connection with my official duties I am a participant in a joint investigation conducted by the FBI and DEA. The subjects of the investigation are members of an international narcotics production and distribution network operating in Sonoma County, California, throughout California, its border states, and Mexico. I have participated in this investigation, reviewed the investigative files gathered in this case by other agents, and have discussed the case with other agents and investigators who have in-depth knowledge of narcotics production and distribution in Northern California. Additionally, I participated in the planning and execution of two monitored narcotics transactions, which are described in this Affidavit.

4. Because this Affidavit is submitted for the limited purpose of obtaining arrest warrants, I have not included each and every fact known to me that supports probable cause for arrest. Rather, I have set forth sufficient facts I believe are essential to support the lawful arrest of the individuals listed in this Affidavit.

5. Within this Affidavit, I have included statements from an individual cooperating with the FBI and the DEA in this investigation. In order to ensure the safety of this individual I have identified him/her as a Cooperating Witness[1]. Reference is made below to an individual hereinafter referred to as Cooperating Witness 1 (CW-1). CW-1 provided

---

[1] For the purpose of this and other Affidavits in this investigation, a Cooperating Witness (CW) is defined as an individual cooperating with law enforcement who has expressed a willingness to testify. Also for the purpose of this and other Affidavits in this investigation, Law enforcement cooperators who have not expressed a willingness to testify are referred to as Confidential Sources (CS).

information pertinent to **MIGUEL DOMINGUEZ MURILLO, MIGUEL MURILLO JR.,** and **FLORENTINO GONZALEZ**.

6. Since 2000, CW-1 has worked as a paid, reliable, cooperating witness for Special Agents of the FBI, DEA, and California Bureau of Narcotics Enforcement (BNE). Since this time, CW-1 has provided reliable information regarding criminal activity in exchange for money, and has been paid by law enforcement since 2000. CW-1 reported he/she received help from law enforcement regarding his/her immigration status in the United States. CW-1's criminal history includes convictions for narcotics sales. Specifically, CW-1 was arrested for cocaine sales, a felony, in 1988. CW-1 received a six month, suspended jail sentence. I am not aware of CW-1 providing any false or inaccurate information to any law enforcement officers. Regarding this case, CW-1 purchased methamphetamine from **MURILLO** on February 27, 2008, and conducted a planned ruse methamphetamine purchase from **MURILLO** on April 1, 2008 (both transactions are described below).

7. Information provided below includes the summarized content of recorded conversations, both telephonic and face-to-face, between CW-1, and subjects of this investigation. It is noted these conversations took place in Spanish. I do not speak Spanish and, I sometimes relied on CW-1 to summarize the content of conversations after they took place. Much of this information was independently verified by surveillance of the recorded conversations, and through physical evidence acquired during this investigation.

8. On February 15, 2008, at investigators' direction and control, CW-1 traveled to Discovery Transport, a trucking company located in Cotati, California, in order to meet with **MURILLO**. The purpose of the meeting was for CW-1 to discuss and negotiate future cocaine and/or methamphetamine purchases by CW-1 from **MURILLO** and/or his associates. During the course of the meeting, according to CW-1, CW-1 and **MURILLO** discussed a first-time, sample purchase of one pound of methamphetamine during the week of February 18, 2008. **MURILLO** quoted a price, per CW-1, of $21,500.00 per pound of pure methamphetamine.

9. During the same meeting, **MURILLO** told CW-1 he (**MURILLO**) utilized his business, Discovery Transport, to distribute methamphetamine. **MURILLO** provided CW-1 with a Discovery Transport business card and advised CW-1 to contact him (**MURILLO**) via cellular telephone number 707-753-6053, the number on the business card. During a debrief with investigators following this meeting, CW-1 identified a California Department of Motor Vehicles drivers license image of **MURILLO** as the individual with whom CW-1 met.

10. On February 27, 2008, at investigators' direction and control, CW-1 met with **MURILLO** at Discovery Transport. The purpose of the meeting was for CW-1 to purchase one pound of methamphetamine from **MURILLO** for $21,500.00. On the referenced date, at approximately 3:50 p.m., CW-1 was directed by investigators to contact **MURILLO** at telephone number 707-753-6039 to confirm the narcotics transaction and to advise that CW-1 was approximately twenty minutes away from the meeting location. During the

course of this telephonic conversation, **MURILLO** advised he was in possession of the methamphetamine and would transfer the methamphetamine to CW-1 inside a wine box containing bottles of wine.

11. At approximately 4:00 p.m., surveillance was established in the area of Discovery Transport. At approximately 4:10 p.m., CW-1's person and vehicle were searched for contraband with negative results. CW-1 was then provided an audio monitoring device that would be monitored during the meeting. CW-1 was then provided $21,500.00 of government funds for the purchase of the methamphetamine. At approximately 4:14 p.m., surveillance agents observed a black Cadillac bearing California license plate 5HTB647. The vehicle was parked in the western portion of the Discovery Transport parking lot. According to a California Department of Motor Vehicle (DMV) records check conducted on March 27, 2008, Elsa Murillo, 1075 Sholem Lane, Sebastopol, California, is the registered owner of the vehicle bearing this license plate. It should be noted that **MURILLO**'s current California drivers license indicates his address is 1075 Sholem Lane, Sebastopol, California. A short time later, a surveillance agent observed **MURILLO** walk to the area of the black Cadillac. **MURILLO** remained in the area of the vehicle until CW-1 arrived on the scene.

12. At approximately 4:30 p.m., CW-1 arrived on scene and parked directly behind the Cadillac. **MURILLO** was observed opening the trunk of the Cadillac, reaching inside, and retrieving a brown box. **MURILLO** then placed the brown box in CW-1's vehicle through the open front passenger window. At approximately 4:35 p.m., **MURILLO** was observed walking away from CW-1's vehicle. At approximately 4:36 p.m., CW-1 exited the area of Discovery Transport and traveled to a predetermined neutral meeting location. CW-1 was followed by agents to the neutral location.

13. At the neutral location, CW-1 handed a DEA agent a brown box containing three bottles of wine and two white Food Max bags containing suspected methamphetamine. Agents searched CW-1's person and vehicle for any additional contraband with negative results. CW-1 told agents he/she paid **MURILLO** $21,500.00 for the methamphetamine. CW-1 further stated **MURILLO** told CW-1 that **MURILLO** could provide CW-1 with large amounts of methamphetamine and cocaine.

14. Sometime after February 27, 2008, the suspected methamphetamine the CW-1 obtained from **MURILLO** was sent to the DEA Western Regional Laboratory for examination. The DEA laboratory results found a net weight of 447.3 grams was submitted to the laboratory containing d-methamphetamine hydrochloride (HCl), with quantitative results showing the substance being 96.5% pure. The amount of the pure drug sold to CW-1 totaled 431.6 grams. Based on my training, experience, and discussions with other law enforcement officials, it is my opinion that this methamphetamine came directly from a facility that manufactures this illegal drug.

14. On March 13, 2008, CW-1 was directed to meet with **MURILLO** at the El Tapatio Restaurant located at 6364 Commerce Drive, Rohnert Park, California. The purpose of the meeting was to negotiate future methamphetamine and/or cocaine purchases by CW-1

from **MURILLO**. At approximately 3:30 p.m., CW-1 was provided with an audio recording and transmitting device and followed by surveillance agents to El Tapatio Restaurant. At approximately 3:45 p.m., agents observed CW-1 meet with **MURILLO** and enter the restaurant. At approximately 4:20 p.m., the meeting concluded and agents followed CW-1 to a neutral location.

15. At the neutral location, CW-1 relayed that CW-1 and **MURILLO** discussed future large scale purchases of methamphetamine. **MURILLO** said, per CW-1, he (**MURILLO**) could provide CW-1 as much methamphetamine as CW-1 wished to purchase. **MURILLO** also noted, per CW-1, that future narcotics transactions would take place at Discovery Transport.

16. On March 25, 2008, CW-1 and **MURILLO** conducted a telephonic conversation. During the conversation, **MURILLO** agreed to sell CW-1 twenty-two (22) pounds of methamphetamine. CW-1 recorded this conversation and telephonically debriefed an FBI Special Agent regarding this call's content. I have not reviewed a recording or transcript of this call.

17. On March 31, 2008, CW-1 was directed to meet with **MURILLO** at Discovery Transport. The purpose of the meeting was to negotiate CW-1 purchasing 22 pounds of methamphetamine from **MURILLO** on April 1, 2008. On March 31, 2008, at approximately 3:45 p.m., investigators established surveillance in the area of Discovery Transport. At that time, surveillance agents observed **MURILLO** standing near the loading dock of Discovery Transport.

18. At approximately 3:47 p.m., agents provided CW-1 with an audio recording and transmitting device, which would be monitored during the meeting. Agents then followed CW-1 to Discovery Transport. At approximately 3:55 p.m., CW-1 arrived at Discovery Transport and met with **MURILLO**. Shortly thereafter, CW-1 and **MURILLO** entered the business.

19. Investigators, including a Spanish-speaking law enforcement officer, monitored the audio transmitter worn by CW-1 during the meeting. During the conversation, investigators heard **MURILLO** stating (in Spanish) that he was good for the 22 pounds and that it was very pure. At approximately 4:05 p.m., agents monitored **MURILLO** placing a telephone call.

20. Also during the meeting, CW-1 placed a cellular telephone call to the Spanish-speaking investigator monitoring the audio transmitter. During the telephone call, the Spanish-speaking investigator acted in an undercover capacity as CW-1's partner. The investigator acted as though he controlled or held the money CW-1 would pay **MURILLO** for the 22 pounds of methamphetamine. During this ruse telephone call, CW-1 allowed **MURILLO** to speak with the Spanish-speaking investigator (**MURILLO** spoke on CW-1's cellular telephone). **MURILLO** told the Spanish-speaking investigator the 22 pound transaction would take place on April 1, 2008.

21. At approximately 4:15 p.m. the meeting concluded and agents followed CW-1 to a predetermined neutral location. At the neutral location, CW-1 told investigators he/she provided **MURILLO** a deflated automobile tire for the purpose of concealing the 22 pounds of methamphetamine. CW-1 told agents **MURILLO** indicated the transaction would take place at Discovery Transport at approximately 5:00 p.m. **MURILLO** said, per CW-1, that the methamphetamine supply came from Colorado. Finally, CW-1 noted that **MURILLO** had given CW-1 a gift of two wine bottles. CW-1 provided the wine bottles to FBI Special Agents, who checked them into evidence at the San Francisco Division of the FBI.

22. On April 1, 2008, CW-1 was directed to meet with **MURILLO** at Discovery Transport. The purpose of the meet was a ruse purchase by CW-1 of approximately 22 pounds of methamphetamine from **MURILLO**. At approximately 3:05 p.m., surveillance was established in the area of Discovery Transport. Surveillance agents, at that time, observed and identified **MURILLO** standing outside the business near the loading dock. Agents also observed **MURILLO** meeting with two Hispanic males, later identified as **MURILLO JR.**, and **GONZALEZ**. **MURILLO JR.** and **GONZALEZ** were observed entering and exiting the business several times prior to CW-1's arrival at Discovery Transport.

23. At approximately 3:15 p.m., investigators directed CW-1 to place a recorded telephone call to **MURILLO** at 707-753-6039. During the conversation, per CW-1, **MURILLO** indicated the narcotics would be present at Discovery Transport at approximately 4:00 p.m. At approximately 4:10 p.m., CW-1 placed a second telephone call to **MURILLO** at 707-753-6039. During the course of the telephone call, per CW-1, **MURILLO** indicated CW-1 should respond to Discovery Transport because the narcotics had arrived. Following the telephone call, agents provided CW-1 (whose vehicle had previously been searched) an audio transmitting and recording device and followed him/her to the area of Discovery Transport.

24. At approximately 4:25 p.m., surveillance agents observed CW-1 arrive at Discovery Transport and exit his/her vehicle. At that time, agents observed **MURILLO** walk to CW-1 and engage in conversation. CW-1 and **MURILLO** then entered the business. A Spanish-speaking investigator monitoring the audio transmitter worn by CW-1 heard **MURILLO** stating the methamphetamine was at the location. Approximately two minutes later, CW-1 called the Spanish-speaking investigator via cellular telephone. During the call, CW-1 told the investigator he/she had observed the narcotics inside the women's restroom and instructed the investigator (as part of the ruse) to proceed to the business with the money to pay for the narcotics. During the conversation, surveillance agents observed CW-1 exit the business and walk to the north or front side of the business. A surveillance agent then directed a team of FBI agents to execute a previously-secured State of California, County of Sonoma search warrant for the location. The search warrant was authorized by Kenneth J. Gnoss, Judge of the Superior Court, County of Sonoma, State of California, on March 28, 2008.

25. Moments later, agents executed the search warrant at Discovery Transport. Agents

located and seized two Abercrombie & Fitch store paper bags and one Robert Mondavi Winery box containing approximately 13.579 kilograms (approximately 29.9 pounds) gross weight, of suspected methamphetamine inside the women's bathroom. The suspected methamphetamine was transferred to the control and custody of DEA agents who transported it to a DEA office where it was placed in a temporary drug storage facility. A DEA agent conducted a presumptive test of the suspected methamphetamine, which tested positive for the presence of methamphetamine. The suspected methamphetamine will undergo further testing at a DEA laboratory.

26. During the initial execution of the search warrant, **MURILLO, MURILLO JR.** and **GONZALEZ** were detained. Agents detained **MURILLO** inside the business, **MURILLO JR.** near the loading dock to the business, and **GONZALEZ** at the large roll-up door to the loading dock at the entrance to the business. The three individuals were eventually taken into custody by the Sonoma County Sheriff's Department for violation of State of California Code Section 11378 H & S, possession of methamphetamine for sale.

27. Immediately following the service of the warrant, agents debriefed CW-1. CW-1 stated he/she was met by **MURILLO** when he/she arrived at Discovery Transport and that **MURILLO** said the methamphetamine was inside. CW-1 and **MURILLO** then proceeded inside. While inside, CW-1 noted he/she saw two Hispanic males standing by several wooden pallets near the loading dock. Agents later identified these individuals as **MURILLO JR.** and **GONZALEZ**. CW-1 told agents he/she asked **MURILLO** if the males were okay and knew what was going on. CW-1 told agents **MURILLO** answered "yes", and that **MURILLO** then directed **MURILLO JR.** and **GONZALEZ** to close the open loading dock door. CW-1 told agents he/she believed **MURILLO JR.** and **GONZALEZ** were told to close the door in an attempt to conceal the methamphetamine transaction. CW-1 explained to agents that he followed **MURILLO** to the women's bathroom at which point he/she observed three bags containing methamphetamine sitting on the floor next to the tire CW-1 provided as a means to conceal the methamphetamine. CW-1 told agents **MURILLO** stated the bags contained 23 pounds of methamphetamine. CW-1 said he then told **MURILLO** he/she (CW-1) would call his/her partner to deliver the money. CW-1 then placed the above-documented telephone call and exited the business. The search warrant was then executed as described above.

28. Also on April 1, 2008, investigators secured and served a State of California, County of Sonoma search warrant for 1075 Sholem Lane, Sebastopol, California, the known address of **MURILLO** and **MURILLO JR. MURILLO** and **MURILLO JR.** provided this address to Sonoma County Deputy Sheriffs on April 1, 2008. During service of this warrant, investigators located and seized, among other items, approximately one quarter ounce of cocaine, over approximately one half pound of marijuana, three pistols, two shotguns, two assault rifles, and multiple rounds of ammunition.

29. All narcotics obtained in the controlled, monitored events described in this Affidavit remain in the custody of the DEA. All non drug related evidence remains in the custody of the FBI.

## SUMMARY

Based on the foregoing, I hereby assert that probable cause exists to believe that **MIGUEL DOMINGUEZ MURILLO, MIGUEL MURILLO JR.,** and **FLORENTINO GONZALEZ** are in violation of Title 21, United States Code, Section 846, specifically, a conspiracy to possess with intent to distribute over one (1) pound of methamphetamine.

_____
MICHAEL G. MAJOR
Special Agent, Federal Bureau of Investigation


SUBSCRIBED AND SWORN TO BEFORE ME
THIS ___ DAY OF APRIL, 2008.

_____
HONORABLE JAMES LARSON
United States Magistrate Judge